312-0992 People of the State of Illinois Appellate by Justin Nicolosi v. Stephen Cole Appellant by Mark Fisher Mr. Fisher, good morning. Good morning, Your Honor. Good morning, all of Your Honors. May it please the Court, Counsel, I'm representing the defendant in this case, Stephen Cole. Mr. Cole was convicted in a jury trial of predatory criminal sexual assault of a child, aggravated battery of a child, and aggravated criminal sexual abuse. Specifically, the jury found that on January 7, 2009, the defendant injured and engaged in an act of sexual penetration with a 20-month-old girl. He was sentenced for predatory criminal sexual assault to a term of 25 years imprisonment. This is the direct appeal from the conviction and sentence, and four issues are raised on appeal. The first issue, the defendant maintains that he was not proved guilty of the charged offenses beyond a reasonable doubt. In fact, he maintains that unrebutted expert testimony presented by the defense showed that he could not have committed these offenses. He therefore asks this Court, respectfully, in Issue 1, to reverse the convictions outright. Alternatively, in Issues 2 and 3, he seeks a remand for a new trial. He does so in the second issue, based on improper comments made by the prosecutors in closing and rebuttal closing arguments to the jury. And he does so in Issue 3, based on the admission of physical evidence that was not specifically tied either to the offenses or to the defendant. And as a final alternative in Issue 4, Mr. Cole submits that the 25-year sentence is excessive. He asks Your Honors to reduce it in light of significant mitigation, including his lack of a criminal record, his military service, his history of employment, substantial family and community support, and the fact that the record shows that these offenses were so out of character for Mr. Cole. On argument today, I'd like to discuss Issue 1, reasonable doubt. Also, Issue 2, the prosecutor's comments in closing argument. Of course, if Your Honors have questions about the other issues, I'll address those as well. The State's case hinged on a single sperm cell that was found by the crime lab on a baby wipe that was inside a diaper that was seized from the child's mother's residence. Based on that sperm cell, the State theorized that the child's injuries were the result of intentional criminal conduct, that they were inflicted by a male, and the State speculated that that male was Stephen Cole. Defense, however, established that Stephen Cole could not have emitted that sperm cell. Now, on January 8th, the morning of January 8th, 2009, the child was brought to the hospital by her mother and her mother's roommate. Two doctors observed her. They found injuries to the child's vaginal area. One of the doctors performed surgery. Now, the surgeon testified she could not be certain whether the injuries were caused intentionally or accidentally. She testified that there are some scenarios where similar injuries can have an accidental cause, and that, frankly, is one problem with the State's case. Now, the other doctor who examined the child reached the conclusion that it was probably intentional conduct and that her thought would be bolstered if sperm was found. And, as I mentioned previously, the crime lab found a single sperm cell on a baby wipe that was with a diaper taken from the child's mother's residence. The State, however, was unable to extract any DNA profile. Consequently, the State was unable to conclusively prove that that sperm cell came from Stephen Cole. Now, the defense called as a witness Dr. James Kenney, a board-certified urologist, an associate professor at the University of Illinois, and the defendant's physician, and the judge found that the doctor was qualified to testify as an expert in the field of urology. Dr. Kenney testified that in 1996, 13 years prior to the charge defenses, Mr. Cole underwent a vasectomy. Now, he acknowledged that, as with any surgical procedure, some vasectomies are unsuccessful. Some vasectomies fail, but he testified that this vasectomy was successful. Now, he also testified that in some cases, even after a successful vasectomy, there is recanalization, where, in essence, the sperm finds another way out. But he basically foreclosed that possibility in this case based on three lab tests done on semen samples taken from the defendant at Methodist Hospital in the spring of 2011, two years after the charge defenses. Those tests were done in three consecutive months on three separate samples, and they showed that there was absolutely no sperm in Mr. Cole's semen. Consequently, the doctor concluded, to a degree of urological certainty, that Stephen Cole could not have emitted sperm in January 2009 when these offenses occurred. Now, the state's entire argument here was basically, well, it's possible, because Dr. Kenney testified that it's possible that sometimes a vasectomy is unsuccessful, and it is possible that sometimes there is recanalization. The state, therefore, argued to the jury, and the state on appeal argues to this court, that it's possible that he could have emitted sperm based on this testimony from Dr. Kenney. Now, it's true the doctor testified it was possible in some cases, but he foreclosed that possibility in this particular case with respect to Stephen Cole. The state's case, therefore, was based on speculation, which is not proof beyond a reasonable doubt, and it was completely rebutted by Dr. Kenney. Furthermore, this was not a case involving a battle of the experts. The state did not present an expert witness. To counter Dr. Kenney's testimony, the state presented no evidence suggesting there was recanalization or anything along those lines in this case. And the case law is very clearly held that expert medical testimony that is not rebutted by other medical expert testimony cannot be disregarded by the trier of fact. The defendant, therefore, submits the state simply did not prove its case here. It was based on speculation. The defense proved that it couldn't have been Stephen Cole. The defendant, of course, acknowledges that the standard of review here is very heavily skewed in favor of the prosecution and in favor of the jury's verdict. The defendant understands he has a very heavy burden here, but he submits on this record that burden has been met, and therefore he submits to your honors not only should you reverse the convictions outright, but on this record I think you must reverse these convictions outright. He respectfully seeks that relief. Now, I sincerely hope that your honors don't even consider the merits of issues 2, 3, or 4, because I assume if you do that means you will have found that the evidence was sufficient in this case. Even if your honors do find the evidence was sufficient, I think you will have to find that the question of guilt or innocence was so close that any trial error would have to be deemed plain reversible error, and that's certainly the case, I think, with respect to the prosecutor's closing arguments. Now, I think any time you have a case involving injuries suffered by a young child, that any jury, any human being, is going to feel a natural sympathy. I don't see how anyone couldn't. But here the prosecutors certainly play on that sympathy, appeal to the motions of the jurors. For example, telling the jury that repeatedly stressing to the jury the child's young age. Practically 20 times telling the jury it was a 21-year-old child, it was a young girl. The state argues on appeal age was an element of the offensive, so it's relevant to talk about. And I would acknowledge it might have been relevant to mention once or twice. To belabor the point, practically 20 times, I think the only purpose could have been to appeal to the jury's emotions, and the only result would have been the jury's feeling that much more sympathetic towards the child, that much more emotional about this case. The prosecutors told the jury that because of the child's young age, she was nonverbal. So she couldn't say what happened to her, she couldn't say whether anyone had done anything to her. But the jury, the jurors, of course, were verbal. They could use their words to point the finger at the defendant. And in essence, asking the jury to become the child's avenging angel, to step into her shoes. Comments like these that ask the jurors to identify with the complainant are completely improper. Prosecutors also told the jury that this case was not about Stephen Cole, this case was all about the child and what was taken from her. Now, obviously, that's a big part of the case, there's no question, but as far as the jury is concerned in a criminal trial, it really is all about the defendant. More specifically, all about whether the defendant has been proved guilty beyond a reasonable doubt. And the jury is supposed to make that decision looking at the evidence dispassionately, objectively. If they accepted the prosecutor's arguments in this case, they did not do that. The defendant was denied a fair trial. The state also shifted its burden to the defense by telling the jury, unless they could be positive that Dr. Kenya was correct, and unless they could be positive that the defendant could not have emitted sperm, then they should look to the other evidence and find the defendant guilty. In a sense, telling the jury, unless you're positive that he's innocent, you have to convict by clearly shifting the burden, and what's almost worse, holding the defense to a higher burden than the state, because the state's burden isn't beyond any doubt, it's a reasonable doubt. When you're saying to the jury, unless you're positive he couldn't do it, then you find him guilty, that's not even allowing any doubt whatsoever. And the state also diminished its own burden by asking the jury to decide which side was more reasonable or more likely. Well, more likely than not is preponderance, much lower than the burden of proof of beyond a reasonable doubt. In summary, the defendant submits that this record shows that a grave injustice was done in this case. The defendant simply was not proved guilty, and he respectfully asks Your Honors to reverse the convictions. This is one of those rare cases where I think that's the only logical and legal result. Alternatively, he respectfully seeks a remand for a new trial. Thank you, Mr. Fisher. Thank you, Your Honors. Mr. Nicolosi. Good morning, Your Honors. May it please the Court. Mr. Fisher. Well, he's a good speaker, isn't he? He's a lot better at this than I am. Since Mr. Fisher, defendant, only discussed issues one and two, I will confine my arguments to issues one and two, of course, if there are any other questions on the other side. If there are other issues, I'd be happy to entertain them. Regarding the sufficiency of the evidence, Your Honors, Mr. Fisher is imploring this Court to believe that the State was merely speculating, and the evidence pointed to the fact that the prosecution below could only speculate that the defendant committed this crime. The people submit that the evidence is stronger than that any rational trier of fact could have convicted on the evidence presented. One of the most important things in this case is the timeline of events. The victim's mother dropped the victim off at the defendant's house. The defendant and his wife babysat regularly for this child. On this day, the day in question, the trial was dropped off approximately 2 o'clock, and the mother testified, and defendant told police, and defendant's wife also testified that the victim's mother changed the baby's diaper at approximately 2.15 shortly before she went to work. This diaper change was normal. There was no blood. There was no injuries. It's certainly reasonable for everyone to conclude that up until that point of that diaper change, there was no injury to this child. Even the mother testified that the child had been healthy all week. No blood, no injuries. So we have this child was healthy until this mother went to work. She left the child with the defendant and the defendant's wife for approximately six hours, a little over six hours, up until approximately 9 o'clock. During this time, defendant's wife testified that she changed the child's diaper at approximately 5.30 or 6 o'clock. I think she said 5.30. The defendant suggested 6 o'clock. And she told Janet Cole, defendant's wife, told officers that when she looked inside the diaper when she changed it, she said, oh, my. Well, the jury heard this, and the jury certainly thought, oh, well, why else would somebody say, oh, my, when they're changing a diaper? It's because they saw something startling. And anyway, so that occurred. And then a few hours later, the defendant, his wife, and the child go pick the mother up, take her home. Mother testifies that she did not change the baby's diaper that night because the baby was sleeping, the child was sleeping, and didn't want to disturb her. And they slept through the night. They slept together in the same bed. The mother testified that nobody had access to this child, that she didn't awaken because there was movement or anything, slept through the night. So this baby, with this injury, sleeps all night long? Evidently, Your Honor. That was the testimony. And the defendant's wife, who sees evidence of this injury on a 20-month-old, assuming it's like blood or something, says, oh, my, and just puts a new diaper on and goes about her business. Evidently, Your Honor. The people would submit that that was to cover the acts of her husband. That seems to be a reasonable interpretation from the evidence. It seems to be what the jury concluded as well. Were either one of the Colts present for the first diaper change at 2.30? It certainly sounds like it. Yes, Your Honor. Were they standing? I don't know about that, Your Honor. I understand from the testimony that there was an individual that had access to this child, not in the presence of the mother prior to this child being taken to the babysitter. Yes. Yes, Your Honor. That's entirely correct. The mother went to her friend Doug's house to obtain a car and left the child inside for about 15 minutes with Doug's friend Todd, I believe. And, yeah, that's undisputed. But, Your Honor, the mother testified that she changed this diaper at the Colts' house at about 2.30 and that there were no injuries. And there's no evidence to refute that particular testimony. And another, to kind of tie that together, the police later, they recovered, I believe, 10 diapers from the child's house, the mother's house, and two diapers from the friend's house. Now, I think it's reasonable to assume that those two diapers are the one that the mother changed at 2.30, approximately 2.15, 2.30, and the one that was changed by Janet Colt at approximately 5.30. Those are the two diapers. There is no testimony that any blood or any evidence of any injuries was found in those diapers. And, of course, we can all assume that if there was blood and injuries in those two diapers found at the friend's house, that would have come out, of course. Okay. So that would include the diaper changed at 5.30? Yes. No evidence of injury? No. Then what was the mother saying, oh, my? That's an excellent question, Your Honor. And I think that could lead to more thoughts by the jury of, well, if the mother exclaimed, oh, my, that there was this injury, then I guess it's reasonable to assume there would have been evidence in this diaper that there was something wrong. And, of course, the jury can assume, because they're the ones who was a trier of fact, that this diaper, that diaper was perhaps hidden. It was put somewhere else, because why would this wife, if she believed that her ---- You said they got two diapers from her house? Yes, yes. From the defendant's house? Yes, yes. And you said there were two diaper changes at that time? Yes. One at 2.30 by the mother, one at 5.30 by the defendant's wife. Yes. That accounts for two diapers. They got them both. So what diaper was hidden at the defendant's house? I'm just, I'm kind of, I don't want to use the word speculate, but what the jury could have been thinking. Go ahead. That's a good word, because that's what you're doing. All right. So the mother takes the child home at what time? Approximately 9 o'clock she was picked up from work. Okay. And then she discovered something wrong at what time? About 7, approximately 7.30 in the morning, the following morning. And at that point, what had happened between, who was present in the mother's house with the child between 9 the night before and 7 the next morning? Only the defendant. Her roommate, John Duncan, was present. He woke up at 10 o'clock. He testified 10 p.m. because he had to get ready to go to work. He was showering, getting ready between 10 and 10.30, and then he left at 10.30 to his job at the hospital at 11. So between 11, I'm sorry, between 10.30 p.m. and 7.30 a.m., it was just the mother, just the mother and the child. So at what point did the defendant have the chance to have any contact with this child? Between 2.15, 2.30 p.m. and 9 o'clock until they pick up the mother. But the defendant's boyfriend that lived with her was at the house. Are we talking about the mother's? I'm talking about the mother's. You said the defendant's boyfriend. I'm sorry, the mother's boyfriend. I'm sorry, the mother's boyfriend was at the house at some point between the time, 9 o'clock at night. Yes. And 7 something the next morning when this was discovered. Only between, yes, between 9 and 10.30 p.m., from 10.30 to 7.30. How long did this take to enter a child like this? Well, Your Honor, the mother testified that she was awake during the whole time that, the whole time she got home and until John Duncan, her roommate, went to work, and that she was with the baby on the couch while John Duncan was getting ready, and that therefore, based on the fact that she was awake with the child, that John Duncan wouldn't have access to this child because she was awake with him. If she's telling the truth. Your Honor, the jury heard the evidence, and they believed that Carissa, the mother, was telling the truth. And again, this isn't a retrial, Your Honors. The jury heard this testimony, and they heard the evidence, and the people believed that they were rational in doing so. And I see where you're getting, Your Honor, but I think the fact that there was no sperm in this diaper, one of the two diapers with blood that were found at the mother's house, I think is very significant here because Kevin Zebe, the forensic scientist, testified that it was odd. It wasn't common that there was indications of semen, that there was tested positive for this P30, which of course is indicative of semen, but that there was no sperm. How many diapers were found at the mother's house? I wrote in my brief that it's nine, but I think it might be ten, nine or ten. Soiled diapers? Yeah, yes, they're all soiled. So she wouldn't have changed this diaper nine or ten times during that? Between nine and seven thirty in the morning? She testified that she did not change the diaper between nine and seven thirty, no. Okay. So in two of these diapers that had evidence of blood and injury in them, one of them tested positive for semen, the other did not. But there was no sperm. There was no sperm in the diaper itself. There was one sperm cell on the baby wipe that was inside of this diaper with the semen, but there was no sperm in the diaper. And the people submit, and they argue this at trial in closing arguments, that this is solid evidence that the person who left this semen had a vasectomy, because if they didn't have a vasectomy, certainly there would be sperm with the semen. Is it relevant at all that the sample was so small that they couldn't even get a DNA profile out of it? Does that have any effect on... Because they're pretty good at extracting DNA profiles, so not only did they get one sperm, but the sample was so small they couldn't get a DNA profile out of whatever material they had. Your Honor, if it was significant or if it wasn't, it was up to the jury to determine the significance of the sample. They clearly believe that because I believe Kevin Z tested 11 areas of this diaper, and either 5 or 6, my memory escapes me, either 5 or 6 tested positive for semen. And whether 6 out of 11 is a small sample, or 5 out of 11, or 6 out of 11 is small, whereas 11 out of 11 would have been significant. Again, Your Honor, I believe that's up to the jury to decide. They clearly believe that the fact that there was semen but no sperm in this diaper indicates that this person, that the person who left the semen had a vasectomy. It wasn't no sperm, it was one sperm. I'm sorry, in the diaper there was no sperm. In the baby wipe that was in the diaper, there was one sperm on the baby wipe. But the people submit that that baby wipe was used by the mother to clean up the child at 7.30 in the morning, which means that it wasn't in the diaper. It could be on the baby wipe from some other, who knows. But the defendant was talking about Dr. Kenny, the urologist, and how he foreclosed the possibility that the defendant could possibly admit this one sperm. The diaper that came off the baby, she uses that baby wipe immediately after that diaper comes off. And so you're saying that that sperm cell could have come from somewhere else? It could have been on the baby wipe previously. I'm not saying it's likely, but again, I'm just trying to, Your Honors, communicate what the jury could have been thinking when they consider all this. Okay, so to back up and say that obviously that the jury believed because there was no sperm in the diapers that it had to be somebody that had a vasectomy. But then you say because there was a sperm on the baby wipe, I mean, I guess to me, if you're saying that in order for it to be somebody with a vasectomy, there couldn't have been any sperm. But now you say there's sperm in the diaper that she takes off the child after the injury. So I think you can't have it both ways. If the person had a vasectomy, there can't be any sperm. And unless you had an expert that said something different than this expert, that there had been recanalization or this was a failed vasectomy, I don't know how you get to use both arguments in favor. Well, I don't need to, Your Honor, come up with exactly what the jury was thinking. I'm just trying to connect the dots. The jury found the defendant guilty, found the evidence sufficient. I'm just pointing to the different avenues of thought that they could have had. And you just mentioned the phrase you can't have it both ways, you can't have both arguments. I would actually submit that Dr. Kenny actually tried to have it both ways. And he said that the defendant, again, said that he foreclosed, Dr. Kenny, he foreclosed the idea that the defendant could admit to sperm, said it couldn't happen. But he also said multiple times, multiple times, that it was possible. Well, you can't have it both ways, can you? Well, is the possibility enough to convict somebody in this country? No, Your Honor, of course not. But that was just, all the jury needed to hear was a justification for why there was only one sperm. Did he say it was possible that Mr. Cole could have deposited that sperm, or that it was possible for somebody who'd had a vasectomy not to deposit sperm? He said it was possible for somebody who had had a vasectomy to deposit sperm. Sometimes because of it either completely not working or because of recanalization. But what did he say, what did the expert say about the possibility of Mr. Cole depositing sperm? It was of his medical opinion, his expert opinion, that he couldn't admit sperm. And did you have any, was there any expert testimony or anything that could refute that? And I'm asking because of the line of cases, Ashley Kay, Juan Adams, you can't just toss away expert testimony like that. You've got to do something that they can't just say, well, don't believe that. I mean, what evidence did you offer, did the state offer? Well, we didn't expressly, we didn't offer an expert to refute that testimony. But, Your Honor, I don't believe the testimony from Dr. Kenney is as rock solid as the defendant presents itself to be. Again, he noted a study where a person after 12 years, after having a vasectomy, impregnated his wife. And again, these tests were, the tests that supported Dr. Kenney's opinion that he couldn't admit sperm, those happened two years after this incident. Who knows about vasectomies? Maybe he could admit sperm in 2009 but couldn't in 2011. I don't know. Again, this isn't a retrial, Your Honors. Let me shift gears for a minute. Thank you very much. I think Mr. Fisher will back me up on this and Osad will too, that nobody's ever called me a bleeding heart liberal, okay? But why isn't this closing argument so far beyond the panel that it is clear prosecutorial misconduct? And let me give you an example. This is where counsel says the defendant... I'm sorry, I thought this was a more clear remark. But where... Thank you. Well, first, I guess while I'm looking, what about the multiple repetitions of the thing about the horrific crime to a 20-month-old child? We can all agree this was a horrific crime to a 20-month-old child. But is the purpose of closing argument to work the jury into a dither and inflame their passion about the child? Of course not, Your Honor. That shouldn't be a focus of a closing argument. But the people would submit that considering this argument as a whole, even the repetitive mentions of this didn't overly prejudice the defendant in this case. And again, the people must note that every single one of those instances was... If the defense counsel deemed it excessive, deemed that the prosecutor was using those terms too liberally, he never forfeited, not once. In fact, all of the different alleged errors of closing argument were forfeited, never objected, never raised them in a post-trial motion. Cases have been... It's been well established that the plain error rule needs to be strictly enforced in the context of closing arguments because it's, number one, it's one of the easier errors that a trial judge can correct. And number two, it would provide, if it wasn't strictly enforced, the plain error rule in this context, it would provide counsel an easy avenue to effect reversal. And that's generally true. I agree with that. But what about the statement on rebuttal where it says, the defense attorney is trying to make this about Mr. Cole. This isn't about the defendant. This is about the victim. Is that what a criminal trial is about? Is it the victim? Don't worry about him. Worry about this horrible injury to this poor little child. I understand, Your Honor. I understand where you're coming from. But at the same token, representing my client as I must, you know, the people who wrote a lot of the comments, again, considering the whole argument as a whole, the argument as a whole... Well, sometimes we have to remind ourselves that sometimes we or one of our children or somebody we love might be on trial. And we want this... We want this happening to them. Sure, sure. And, Your Honor, I'd like counsel to acknowledge that age was an element of the offense here, of all the offenses here. And, of course, this child couldn't testify. When you've got a horrific crime like this, isn't it even more important in a case like that where the jury's, you know, people want blood because it's normal human thing, right? Thinking people want to punish somebody who would do this to a child. And isn't it even more important in that case because of that natural human tendency to make sure that the person on trial for this gets protected in the sense that they get a fair, not a perfect trial, but at least a fair trial. Sure, sure. And that we don't use the thing to, you know, whip these people up into a feeding, the jury into a feeding frenzy so that, you know, they're walking into the jury room going kill, kill, kill. You know, that's not the point. Sure, sure. I agree. I agree. I don't have any response to that. Other to say, all the errors were forfeited in the closing argument. That's all I got. If there are any other questions, I'd be more than happy to entertain them. Okay. Thank you. Mr. Fishers on rebuttal. Yes, Your Honor. Early on in this argument, the State talked about the timeline here. The State talked about the timeline to the jury as well. I would submit, Your Honors, however, that the timeline doesn't really prove all that much in this case. This would be a very different case if the timeline was so short that the injuries could only have been inflicted or only have been suffered while the child was in the care and custody of the defendant and his wife. But that wasn't the case. Now, doctors testified that they saw no signs of healing, and therefore the injuries could not have been more than a couple of days old. They didn't want to get much more specific than that. Now, one of the doctors said the injuries could have been inflicted within a couple of hours prior to the time she came to the hospital. Well, for about 12 hours before she came to the hospital, she was in the care and custody of her mother. She was not at the defendant's residence. According to a police officer, one of the doctors testified or told him that it was probably an 8- to 24-hour timeline and maybe even as long as 48 hours. Now, unfortunately, it wasn't clear is that backtracking from the time she was seen by the doctors or from the time she actually came into the hospital, because the surgeon saw her in the afternoon, although she came in in the morning. In any event, as the state notes, she was babysat by the defendant and his wife for maybe about 5 to 6 hours. It was only part of that time frame. She was with the mother before, she was with the mother after. So this is not a case, as we have some cases where the time frame shows the individual could only have been injured, could only have been killed while with the defendant. That is not this case. And so the timeline really doesn't do that much. It certainly doesn't prove guilt beyond a reasonable doubt. Your Honor, Justice Schmidt, I think, if I read Your Honor correctly, was commenting, in fact, that the child slept all night. That would seem to be inconsistent with the state's theory that she had received these injuries the previous afternoon. Trial Defense Counsel argued that to the jury. It didn't win the day, but that is certainly, I think, an odd circumstance about this case. There's some talk about John Duncan. There's testimony that, yes, the mother was awake while Duncan was at the home that evening. But at least during part of that time, she was talking to a friend on the telephone. Her attention was obviously distracted. It's not like she had her eyes right on the child and Duncan the entire time. It's interesting. There's some indication that Duncan was lying, but there's testimony that Duncan was home for maybe an hour that night from the time that the mother came home with the child until Duncan had to go to work. There were no records from his workplace, the hospital, actually, showing the time that he worked. I pass that on for what it is worth. It's interesting, a couple of the comments made by Mr. Nicolosi saying he doesn't really have to figure out what the jury was thinking. Almost as if to say the jury found him guilty and we have to accept that. That's certainly not the case. He also said that, well, maybe Stephen Cole could not emit sperm in 2011. Maybe he could in 2009. Again, the whole state's case was maybe, and maybe isn't enough to get it done in a court of criminal law. The evidence has to be a little bit more than maybe, and one knows what the jury was thinking, but they came back guilty, and so that's good enough for us. I think the state has to have a pretty good idea going in what the evidence shows and why that would lead, a rational prior effect, to find guilt. And the state didn't do that in the trial court, and they can't do that here on appeal. Your Honor, Justice O'Brien noted that you can't just simply talk away expert medical testimony, and I agree with Your Honors that that's what the case law shows. Again, the psychomy 13 years before, test done two years after, both showing that this man could not emit sperm. That's it. Now, I think the doctors, when he said, well, he almost said, well, anything's possible in response to some of these questions, almost sarcastically. I think he was being a little bit overly charitable, but when he said that, he also said, you know, it's possible he could be invaded by aliens tomorrow, or it's possible I could win the lottery. Actually, I think there's a greater possibility of him winning the lottery than this man having been able to emit sperm. He foretells that possibility, and the state presented nothing to refute it. Case closed. That should have been case closed. Defendant submits, again, on this record, there was simply a grave injustice done here. The case was not proved. And if anything, it was proved. It was proved by the defense that it couldn't have been Stephen Cole, and he therefore respectfully asks Your Honors, again, submitting it. It's a rare case, I acknowledge that, but respectfully asking on the record here to reverse outright. Thank you, Mr. Chairman. Thank you, Your Honors. Mr. Nicolosi, thank you. This matter will be presented under advisement, and a written disposition will be issued. Right now, we will be in a brief recess for a panel change before the next panel.